Charles RIGBY, Plaintiff,

v.

BAYER CORPORATION, Formerly Known as Miles, Inc. and Bayer Inc. Cornerstone Flexible Benefits Program, Defendants.

Civil Action No. 1:94CV754.

United States District Court,
E.D. Texas,
Beaumont Division.

July 8, 1996.

Joe Fisher, Provost & Umphrey, Beaumont, TX, for plaintiff.

Daniel Bell and John Myers, Eckert, Seamans, Cherin, Mellott, Pittsburgh, PA, Jack Urquhart and Faye Caldwell, Holtzman, Urquhart Bayko & Moore, Houston, TX, for defendants.

### MEMORANDUM OPINION

HEARTFIELD, District Judge.

This is an ERISA employee benefits case wherein the plaintiff, Charles Rigby (Rigby) seeks to recover long-term disability benefits that were terminated when defendant Bayer Corporation (Bayer) determined that he was not totally "disabled." A non-jury trial was held to determine two issues: (1) whether Bayer's determination that Rigby was not "totally disabled" was arbitrary and capricious, and (2) whether Bayer provided Rigby with "a reasonable opportunity for a full and fair review." The court enters the following opinion.

### I.  Facts

Plaintiff, Charles Rigby (Rigby), worked for Bayer Corporation (or its predecessors in interest) from March 5, 1979 until August 21, 1990, as a systems craftsman at the Orange, Texas plant. He procured insurance under an employee welfare benefit plan governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. (ERISA).[1]

The Plan provides disability benefits in the short run and in the long-run. Short-term disability (STD) benefits are given to participants who are under the care of a physician and based on medical evidence of illness or injury for which the company determines in its sole discretion that you are unable to do your job or any other work for which you are reasonably trained or educated. STD benefits last for 26 weeks. Long-term disability (LTD) benefits are paid to partici-

pants who are "totally disabled," meaning that you are unable to work at any job for which you are qualified by education, training, or experience. Under the Plan, if an employee receives STD benefits for six months and continues to be disabled from the same or related disability, the employee is eligible to receive LTD benefits.

In August 1990, pursuant to the terms of the Plan, Rigby applied for and was granted STD benefits based upon worsening vision in his right eye. Since the STD benefits expired after six-months, in January 1991, Rigby applied for and received LTD benefits. Rigby's application was supported by a physician's statement prepared by Dr. Rosa Tang, dated January 29, 1991, in which Dr. Tang diagnosed Rigby with optic neuropathy (right eye) and muscular scarring (left eye). She stated in a follow-up letter to the exam that he was legally blind, disabled, and she could not estimate when he would be able to return to work. Relying on Dr. Tang's assessment, Bayer granted LTD benefits. Thus, in January of 1991, Rigby was determined "unable to work at any job for which [he was] qualified by education, training and experience;" that is, Rigby was determined "totally disabled."

To maintain a status of total disability a participant is required to periodically provide the claims administrator with medically verified proof of disability. Also periodically, the claims administrator may ask the benefits recipient to be examined by an independent doctor to verify the continuing disability. Rigby periodically provided the Plan's claims administrator, Northwestern National Life Insurance Company (Northwestern), with a physician's statement of disability from Dr. Rosa Tang. In fact, Dr. Tang sent Northwestern a physician's statement of disability dated June 30, 1993, stating that Rigby was legally blind with optic neuropathy in his right eye and toxoplasmosis in his left eye.

**1.** The original plan which Rigby participated in was called the Mobay Chemical Corporation Salaried Employees Disability Income Plan, because Rigby worked for Mobay Chemical Corporation. On January 1, 1992, Mobay Corporation was merged into Miles, Inc. and the new plan was called the Miles Inc. Cornerstone Flexible Benefits Program. The disability determination chal-

lenged in this case was made under this Miles Inc. Cornerstone Flexible Benefits Program plan, which will be referred to as the Plan. In April 1995, Miles Inc. was renamed Bayer Corporation, and the Plan was renamed the Bayer Inc. Cornerstone Flexible Benefits Program. Currently, the Plan's official name is the Bayer Corporation Disability Plan.

In November 1993, certain Bayer representatives at the Orange, Texas facility received information that Rigby was engaging in activities, including driving a vehicle, that called his disability status into question. Based on that information, Bayer requested that Northwestern, as part of its duties as claims administrator, investigate Rigby's activities to determine whether they were consistent with total disability status. Northwestern hired a private investigator who videotaped Rigby's activities on March 15, 20, and 21, 1994. The videotapes capture Rigby driving, carrying and using a ladder, carrying and using a shovel, and picking up, carrying and placing in a pile various debris at a home construction worksite. The videotapes and summaries from the investigation were forwarded to Northwestern, then to Bayer's Orange, Texas plant, and finally reached Bayer's corporate headquarters for review by Patricia Greb, a member of the corporate welfare benefits staff responsible for administration of the Plan.

On April 12, 1994, Nancy Wallen, at Northwestern, requested specific information from Dr. Tang concerning Rigby's impairment. The information provided by Dr. Tang in response stated that she believed him to be disabled from performing any 'gainful' occupation. Dr. Tang restricted his daily activities to "no driving, no work with machinery."

Based on the results of the investigation, Northwestern's representative Nancy Wallin reviewed Rigby's claim file, including the medical evidence previously submitted by Dr. Tang, and concluded that Rigby did not satisfy the Plan's definition of "total disability." In making a decision Wallin compared Dr. Tang's opinion that Rigby was totally disabled with the information obtained through the investigation indicating that Rigby was not totally disabled. Although the information before Wallin was inconsistent, she weighed the investigation results and decided that Rigby's benefits should be terminated.

Since Wallin, as Northwestern's representative, could not make a final determination as to benefits, she contacted people at Bayer's corporate headquarters. On July 7, 1994, Wallin conferred with Greb about Rigby and provided her a draft letter relating to the termination of Rigby's benefits. Based on that conversation, Greb, who had previously received and reviewed the investigation videotapes and summaries, conferred with her supervisor, Joyce Fleischer, Manager–Corporate Benefits, and both concluded that Rigby was not totally disabled under the Plan. Greb, in turn, contacted Wallin and authorized her to terminate Rigby's benefits.

By letter dated July 8, 1994, Wallin informed Rigby that his benefits would terminate as of July 16, 1994, because he did not satisfy the Plan's definition of "total disability." The letter stated that during an investigation of his disability, it came to Northwestern's attention that he was involved in activities that demonstrated that he was not totally disabled. The letter further informed Rigby that he could request a review of the termination decision within 60 days and that he could enclose any information which could impact the decision.

Rigby, by counsel, sent a letter dated August 17, 1994, to Wallin requesting a review of the termination decision. Attached to the letter was medical information from Dr. Tang, consisting of physician's statements from June 24, 1994, October 23, 1990, September 19, 1990, and August 30, 1990. Rigby's letter also informed Wallin that an additional report from Dr. Tang would be sent to respond to the July 8 termination letter. Furthermore, Rigby asked Northwestern to refrain from processing the appeal until the opinion letter was provided. Wallin notified Rigby that the review of the disability determination would not take place until she received Dr. Tang's additional report.

On October 6, 1994, Wallin received a report from Dr. Tang dated September 16, 1994. The report provided a summary of the problems experienced by Rigby and the ultimate conclusion that he could not go back to his Systems Craftsman job. "He is unable to perform the duties for which he was qualified and trained for previously." "He would have to continue activities that do not involve operation of dangerous machinery and would be unable to maneuver unsafe working areas and perform fine detailed work." Neither Rigby, nor the Plan obtained any other medical opinions or vocational rehabilitation infor-

mation before review of the disability determination.

On October 27, 1994, an ERISA committee meeting was held to review Rigby's file. Wallin presented the matter to Jerry Neisheim and Les Kuhn. She presented the videotape information, plus an explanation of what she had seen on the video, the medical records from Dr. Tang, a history of Rigby's benefits claim, and her recommendation that the initial decision should be affirmed. During the meeting, Wallin specifically compared Dr. Tang's ultimate conclusion that Rigby was disabled with the information on the videotapes. She pointed out that her initial determination did not square with Dr. Tang's opinion. Ultimately, the committee determined that Rigby was not disabled. Therefore, the committee recommended that the decision to terminate benefits be affirmed.

Wallin contacted Patricia Greb at Bayer's headquarters and informed her that based on review of the videotapes, summaries, and Rigby's medical record, the ERISA committee recommended that the decision to terminate benefits be affirmed. Bayer authorized Wallin to inform Rigby that the decision had been upheld.

On November 9, 1994, Wallin sent Rigby a letter explaining that the ERISA committee had determined, based on available information (including Dr. Tang's opinion letter), that the decision to terminate his benefits would be affirmed.

Plaintiff now sues alleging (1) that Bayor wrongly determined that he was not "totally disabled" under the Plan, and (2) that Bayor did not provide him with a reasonable opportunity for a full and fair review.

## II. Denial of Benefits

The Fifth Circuit has recognized that before benefits are paid or denied, a plan administrator has to make determinations that may be divided into two general categories. First, he must determine the facts underlying the claim for benefits. Second, he must then determine whether those facts constitute a claim to be honored under the terms of the plan, i.e. interpretation of plan terms. *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552 (5th Cir.), *cert. denied*, 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991). This court's role is limited to reviewing each of the plan administrator's determinations under the abuse of discretion standard.

■ Since ERISA is silent as to the proper standard of review, the abuse of discretion standard arose out of case law. The abuse of discretion standard for the first determination—the facts underlying the claim for benefits—was determined by the Fifth Circuit in *Pierre*. In reaching that decision, the court noted that according to trust principals, an ERISA fiduciary possesses inherent authority to control and manage the operation of the plan. The court further reasoned that in virtually all decisional review, some deference is given to the fact finder. Therefore, abuse of discretion would be the appropriate standard of review for this court to determine whether Bayer correctly determined the facts underlying Rigby's claim for benefits.

■ The standard of review in the second inquiry-application of the facts to the plan's terms—was set forth by the Supreme Court in *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). There, the court stated that a review of denial of benefits depends on whether or not the plan grants discretion to the administrator to interpret plan terms. If the plan grants discretion to the administrator, then deference should be given to his decision. In giving deference, a court would apply an abuse of discretion standard. On the other hand, if the plan does not grant discretionary authority to the administrator to interpret the plan terms, de novo review is appropriate. Later the Fifth Circuit in *Pierre* reenforced this reading of the Supreme Court's decision in Firestone. *Pierre*, 932 F.2d at 1556.

In this case, Bayer is the sponsor and administrator of the Plan. The language of the Plan unquestionably gives Bayer "the exclusive right to make any findings of fact necessary or appropriate for any purpose" under the Plan and "the exclusive discretionary right to interpret the terms of the [Plan] and to determine any and all questions arising under the [Plan] or in connection with the

632

administration of the Plan. The summary plan description informs Plan participants that determination of the facts, as well as the application of the definition of "total disability" to those facts is within the sole discretion of the Plan Administrator. Thus, because the Plan grants Bayer authority to make factual determinations, any interpretation of the Plan's terms would also be reviewed under the arbitrary and capricious standard. Courts use a two-part test in reviewing these plan interpretation cases.[2]

The court agrees with the defendant that this case does not even remotely turn on sophisticated plan interpretation issues. No portion of the Plan language defining total disability is even arguably ambiguous. The Plan provides long term disability benefits only if "you are unable to work at any job for which you are qualified by education, training, or experience."

▆ The sole issue before this court is whether the evidence contained in the administrative record demonstrates that Rigby could perform any job for which he was qualified by education, training, and experience. That is, did the evidence before Bayer and Northwestern support a discontinuation of Rigby's long term disability benefits? There is no specific test to apply like the two-step analysis for reviewing plan interpretation. The only standard in reviewing a factual determination is abuse of discretion.

The meaning of "abuse of discretion" is difficult to ascertain. The court in *Pierre* explicitly stated that it is not the same as "arbitrary and capricious." It stressed a concern that "arbitrary and capricious" is

inapplicable because it may be applied and interpreted in a manner that is "too stringent." *Pierre*, 932 F.2d at 1562. Rather, the *Pierre* court determined that under an abuse of discretion standard, federal courts owe due deference to an administrator's decision that reflects a reasonable and impartial judgment. Similarly, a Louisiana district court held that the standards are not identical. *Nunez v. Louisiana Benefit Committee*, 757 F.Supp. 726 (E.D.La.1991). Instead, the court applied a "manifest error" test to abuse of discretion. The reviewing court may reverse if it finds that the administrator's decision was manifestly erroneous, i.e. when the reviewing court finds that there has been a clear error in judgment. *Id.* at 734. This appears to be a lower standard upon which a reviewing court can reverse the administrator's decision.

Most courts, however, equate the "abuse of discretion" standard with "arbitrary and capricious." *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 635 n. 7 (5th Cir.1992) ("We detect only a semantic, not a substantive difference" in the abuse of discretion and arbitrary and capricious labels.); *Salley v. E.I. DuPont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir.1992) ("In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily and capriciously."); *Penn v. Howe–Baker Engs., Inc.*, 898 F.2d 1096 n. 2A (5th Cir.1990) ("[T]he way to review a decision for abuse of discretion is to determine whether the plan committee acted arbitrarily or capriciously.").

2. In cases where deference should be given to the plan administrator's interpretation of plan terms, the Fifth Circuit has employed a two-step process in analyzing administrators' interpretation of benefit plans. First, the court must determine the legally correct interpretation of the plan's provisions. This involves considering (1) whether the plan administrator has given a uniform construction to the plan, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) whether the interpretation results in any unanticipated costs. If the administrator has given the plan the legally correct interpretation, the inquiry ends. However, if the administrator has not given a plan the legally correct interpretation, the second determination for the court is whether the administrator's in-

terpretation constitutes an abuse of discretion. The court should consider three factors: (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith. *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir.1992); *Jordan v. Cameron Iron Works*, 900 F.2d 53 (5th Cir.), *cert. denied*, 498 U.S. 939, 111 S.Ct. 344, 112 L.Ed.2d 308 (1990); *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 444–45 (5th Cir.1989); *Dennard v. Richards Group, Inc.*, 681 F.2d 306 (5th Cir.1982).

This court does not find a material difference in how case law has applied abuse of discretion or arbitrary and capricious. Accordingly, the terms may be used interchangeably throughout this opinion. Either way, the key seems to be to look at the administrative record and determine whether the administrator's decision was supported by substantial evidence. Another way of stating this is inquiring whether the administrator's decision was reasonable and impartial.

■ The arbitrary and capricious standard offers courts review of limited scope. The court cannot substitute its own judgment for that of the defendant-plan administrator. *See Denton v. First National Bank of Waco,* 765 F.2d 1295 (5th Cir.1985). The standard exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with the judges whose exposure is episodic and occasional. *LeFebre v. Westinghouse Electric Corp.,* 747 F.2d 197 (4th Cir.1984).

■ When applying this deferential standard to a factual determination, a district court must base its decision solely on the evidence that was available to the plan administrator at the time the challenged decision was made. *Southern Farm Bureau Life Insurance Co. v. Moore,* 993 F.2d 98, 102 (5th Cir.1993); *Wildbur,* 974 F.2d at 642. Any evidence obtained after review of Rigby's decision may not be considered by this court.

Applying the foregoing principals to the case at bar, the court is of the opinion that there is not substantial evidence in the administrative record to support a finding that Rigby was no longer disabled. The Plan defines "total disability" as one who is unable to work at *any* job for which he is qualified by education, training, or experience" (emphasis added).

In deciding whether or not Rigby met the definition of total disability the administrative review committee had before them Rigby's file consisting of medical records from Dr. Tang, the videotapes from the investigation, and the surveillance and investigation reports. The videotape showed Rigby driving a car, using a ladder and shovel, picking up and burning trash, and moving about freely without assistance. The medical reports from Dr. Tang stated that he was legally blind and totally disabled under the Plan's definition. Dr. Tang report of September 16, 1994 stated that because of his vision, she felt that "he is unable to perform the duties for which he was qualified and trained for previously." By this she was referring to his past experience, education, and training in repairing and calibrating instruments.

Based on the medical records of Dr. Tang, on the one hand, declaring Rigby disabled, and the investigation, on the other hand, showing Rigby performing activities that were inconsistent with Dr. Tang's medical assessment, Bayer accorded greater weight to the investigation. The benefits were terminated.

Bayer did not send Rigby to an independent eye doctor or to a vocational expert. In its examination of Fifth Circuit case law, this court has found no explicit requirement that a benefits determination be supported by a medical opinion or a vocational expert's opinion. However, in every opinion found, the administrative committee either had the support of a doctor or a vocational expert. *See Duhon v. Texaco,* 15 F.3d 1302 (5th Cir.1994) (holding that where plaintiff was examined by his family doctor, an independent general practitioner, and an orthopedic specialist, and his records were reviewed by two company physicians, the administrator did not abuse discretion in terminating benefits in reliance on the medical opinions stating that although plaintiff could not do his old job, he could do light sedentary work); *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594 (5th Cir.1994) (holding that the administrative record, including medical records, evaluations of the medical records by independent medical consultants, and the results of an investigator who interviewed the plaintiff, contained ample evidence to support a finding · that plaintiff was not permanently disabled); *Southern Farm Bureau Life Ins. Co,* 993 F.2d at 98. (holding that plan administrator's denial of benefits based on the factual determination about a plan participant's

cause of death was supported by autopsy report and three medical records and therefore it was a reasonable decision); *Pierre,* 932 F.2d at 1552. (holding that plan administrator's denial of benefits based on the factual determination that the plan participant's death was not "accidental" within the terms of the policy was not an abuse of discretion because the determination was supported by the police investigation, private investigation, and conversations with the deceased's wife); *Chabert v. Provident Life & Accident Company,* 1994 WL 374213 (E.D.La.1994) (holding that factual determination that plaintiff was no longer totally disabled under the plan was supported by substantial evidence, including plaintiff's own doctor, an independent doctor (paid by plan), and a vocational rehabilitation exam (paid by plan)).

The one case where the court found that the administrative committee abused their discretion, the committee had conflicting medical opinions and they relied on the doctor that did not perform objective tests on the patient. *Nunez,* 757 F.Supp. at 726. Here, after a beneficiary recipient was seen running errands around town, her claim was reexamined. She was sent to the local company consultant for a second opinion. After this second exam, the doctor opined that she was able to return to work under significant physical restrictions. Upon review, the administrative committee accepted the second opinion of its company medical consultant over that of three other physicians whose opinions were submitted. Accordingly, benefits were terminated. However, the company physician did not review x-rays or order objective diagnostic studies, such as a CT-scan or an MRI. The three other doctors who submitted reports, found plaintiff disabled based on physical examinations, x-rays and CT-scans. The court found that reliance on the company consultant's opinion over the opinions of doctors who relied on objective tests to base their findings was an abuse of discretion. Furthermore, the court pointed out that the committee did not request or require that vocational studies be done to determine whether the plaintiff could perform her job duties, which were significantly different from those she was observed to be doing.

In addition to a lack of medical or vocational expertise to support the termination decision, the administrative committee did not even have information about Rigby's education and previous job experience. Without either medical support, a vocational expert's report, or information about Rigby's education and experience the court finds that Bayer could not reasonably have made a determination about total disability. There was simply not substantial evidence to determine (a) what was Rigby's previous education, training, or experience, and (b) whether or not his disability had improved enough that he would be capable of performing at least one job which fit with his previous education, training, and experience. *See Toland v. McCarthy,* 499 F.Supp. 1183 (D.Mass.1980) (holding that where trustees have an obligation to take the initiative to cause reasonably available evidence to be developed and considered in the decision-making process, the failure to do so is arbitrary and capricious).

The only evidence the committee used to support its termination decision was the videotapes. The videotape merely shows Rigby driving for short distances, walking around, picking up objects, climbing a ladder. Most of these activities are consistent with Dr. Tang's evaluation. The only questionable activity is his driving. Rigby explained, through his testimony, that he was able to see peripherally but had lost his pinpoint vision. He described his condition by stating that it was like putting on eye glasses with nickels glued to the center of each lens. The viewer would be able to see everything around the nickels but nothing in the center. One can see how a person in this condition might be capable of, however unwise, driving short distances, in areas of low traffic. Nevertheless, it would be difficult or impossible for such a person to read or have a sharp view of objects.

In his condition, Rigby may very well be able to work in a job for which he is qualified by education, training, and experience. He may not. It is not for this court to decide. The decision should be made by Bayer, the Plan administrator. The court only requires

that Bayer's decision be reasonable, impartial, and supported by the substantial evidence.

### III.  Full and Fair Review

Because the court has decided the case on the issue of denial of benefits, we need not reach the issue of full and fair review.

### IV.  Conclusion

The court REMANDS this case to the Plan administrator for a factual determination, pursuant to this opinion, on the issue of whether or not Rigby is "totally disabled" under the Plan.